UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                              :
ALBERT P. MORAS,                                              :
                                                              :
                                                              :            11 Civ. 2081 (PAE)
                                             Plaintiff,       :
                         -v-                                  :            OPINION & ORDER
                                                              :
MARCO POLO NETWORK, INC., MARCO POLO                          :
CAPITAL MARKETS, LLC, and VINODE BHESHAM                      :
RAMGOPAL, *individually and d/b/a Marco Polo Group*,          :
                                                              :
                                             Defendants.      :
                                                              :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

On December 11, 2012, the Court issued its judgment in this case, following a three-day

non-jury trial.  This opinion sets forth the Court's findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52.

Plaintiff Albert Moras brought this action against his former employers, Marco Polo

Network, Inc. ("MPN") and Marco Polo Capital Markets, LLC ("MPCM"), and against Vinode

Ramgopal, individually and doing business as Marco Polo Group (collectively, "defendants").

He alleges that, between October 2008 and his termination in January 2011, defendants paid him

less money than the amount to which he was entitled under his employment agreements with

them.  On this basis, he brings claims under New York law for breach of contract, fraud, and

unjust enrichment; and for violations of New York State Labor Law ("the Labor Law") §§ 190 *et*

*seq*.  As a remedy for these violations, Moras seeks an award of compensatory damages of

$339,351.44; and, under the Labor Law, liquidated damages of 25% of the total amount of

unpaid wages, plus attorney's fees and punitive damages.  The defendants, for their part,

acknowledge that MPN and MPCM owe Moras some salary based on their underpayment of his contractual wages, but assert that Moras is owed only $69,760.

Trial was held on December 3, 4, and 11, 2012. Three witnesses testified: Moras, Ramgopal, and Clifford Goldman. The Court received each witness's direct testimony in the form of a sworn declaration; cross-examination, and ensuing re-direct and re-cross examinations, were live. The Court also received numerous documents as exhibits.

As reflected in the judgment which issued December 11, 2012, *see* Dkt. 45, the Court finds:

1. On Count One, alleging breach of contract, in favor of plaintiff Moras against defendants MPN and MPCM, and awards Moras $125,360 on this count, plus prejudgment interest at a rate of 9% per annum, to be calculated from April 1, 2009, until December 11, 2012, the date of entry of judgment. As to the claim in Count One against defendant Ramgopal, judgment has been entered in favor of Ramgopal.

2. On Counts Two through Five, in favor of all defendants.

**FINDINGS OF FACT**

## I. Background

The areas of material factual dispute between the parties to this case are limited. The parties agree on the duration of Moras's employment with the Marco Polo entities (May 12, 2008 through January 25, 2011). They also agree upon the amount of money Moras was paid during the course of his employment. The principal area of dispute between the parties is the salary (measured in annual terms) to which Moras was contractually entitled. The Court's decision on this issue resolves the extent to which Moras was underpaid. As to that issue, Moras argues that

2

at all times, he was entitled to be paid a $175,000 annual salary.  Defendants argue that Moras's annual salary was reduced to $120,000 effective October 1, 2008, as a result of the belt-tightening at MPN necessitated by the financial crisis, and remained at $120,000 for the balance of Moras's employment.  On this basis, defendants admit to owing Moras $69,760.  The parties differ on which defendant entities are liable to Moras for back wages.  All agree that MPN and MPCM are liable.  Moras also urges, but defendants dispute, that Ramgopal is liable for those wages, either because the corporate veil is properly pierced to reach him, or because he was an employer of Moras within the meaning of the Labor Law.

Although not as to every particular, the Court generally found all three witnesses to be credible.  The Court's determinations as to Moras's salary (that it was $175,000 until October 1, 2009, when it became $120,000, and that it remained $120,000 until Moras's termination) and as to veil-piercing (that Ramgopal is not properly reached) are largely based on conclusions drawn from documents and facts not meaningfully in dispute.

A. *The Parties:  Facts Relevant to Diversity Jursidiction*

1. Plaintiff Albert P. Moras is domiciled in and a citizen of the State of New Jersey.

2. Defendant MPN is a corporation duly organized and existing under the laws of the State of Delaware.

3. Defendant MPCN is a limited liability company duly organized and existing under the laws of the State of Delaware.

4. Both MPN and MPCM, at all relevant times, had their principal place of business at 75 Broad Street, 15th Floor, New York, New York 10004.

5. It is undisputed that neither MPCM nor any of its limited liability members are citizens of the State of New Jersey.  Joint Stip. of Facts ¶¶ 2–16.

3

6.     Defendant Vinode Bhesham Ramgopal is a resident of Suffolk County in New York State, and is domiciled in and a citizen of the State of New York.

   B.   *Moras's Employment with Marco Polo*

        i.   *MPN*

7.     In or about April 2008, Moras interviewed for employment with MPN.  At this time, Moras met with Ramgopal.  Joint Stip. of Facts ¶ 20.  MPN is a worldwide financial services company that "provides a multi-asset class platform that supports trading in listed equities on various stock exchanges."  Ramgopal Aff. ¶ 1.  Ramgopal founded MPN, and was, during the relevant time period, its CEO and one of its directors.  He was also the CEO and a director of MPCM.  *Id.*

8.     On or about May 4, 2008, Moras received an offer letter from MPN, signed by Clifford Goldman, who was, during the relevant time period, director and CFO of MPN and MPCM, and President of Marco Polo Securities.  The letter outlined the terms of Moras's employment.  Ex. 10 ("May 2008 Agreement").

9.     The May 2008 Agreement provides:  "You [Moras] will be paid an annual salary of $175,000.00."  *Id.* ¶ 4.  In addition to an annual salary, Moras was to "participate in [MPN's] annual performance bonus program upon completion of 12 months of service with [MPN]," which were to be paid in a combination of cash and stock.  *Id.*

10.    The May 2008 Agreement also provides:

"At Will Employment:  Your employment with [MPN] will be on an 'at-will' basis.  Therefore, this letter agreement does not constitute any contract or obligation on the part of [MPN] and does not guarantee your employment for any specific duration.  You or [MPN] may terminate your employment at any time, for any reason, with or without notice or cause."

*Id.* ¶ 9.

4

11.     The May 2008 Agreement also provides:  "You shall be entitled to 15 working days of vacation time per year pro-rated from your Start Date."  *Id.* ¶ 7.

12.     The May 2008 Agreement also provides:  "This letter agreement may not be modified or amended except by written agreement signed by the Company and you."  *Id.* at 2.

13.     Moras accepted the offered position and countersigned the agreement.  On May 12, 2008, Moras commenced employment with MPN.  Joint Stip. of Facts ¶¶ 22–23.

14.     At MPN, Moras served as a Special Vice President and head of fixed income securities for Latin America.

15.     Between May 12, 2008, and the end of September 2008, Moras was paid at a rate of $14,583 per month, consistent with the $175,000 annual salary provided for in his contract.

16.     In late 2008, MPN began having financial difficulties, as a result of the financial crisis that affected many financial institutions and their service providers.  Bear Stearns and Lehman Brothers, among other, were clients whose need for MPN's services diminished.  Ramgopal Aff. ¶¶ 5–6.

17.     During this time period, Moras continued to work for MPN.  However, beginning in October 2008, he and other employees of MPN were paid below their annual salaries, as a result of MPN's financial difficulties.  Between October 2008 and July 2009, Moras was not paid his monthly salary.  He instead received a total of $17,600 in advances.

18.     A central dispute between the parties is whether or not, in fall 2008, including at group meetings held by MPN management with its employees, Moras agreed to a reduction of his salary.

A.      Ramgopal testified that Moras was present at meetings on October 15 and 16, 2008, and that, at these meetings, Ramgopal announced that MPN would have to cut salaries.  Ramgopal testified that he cut Moras's annual salary to $120,000, effective October 2008.  However, Ramgopal did not testify that Moras ever agreed to any such reduction.

B.      Moras testified that, in October 2008, he attended group meetings about the company's financial difficulties, and was told that a number of employees would have their salaries affected.  He testified, however, that he was not ever told that his salary had permanently been reduced to $120,000, or that he had been terminated.  Moras testified that he was informed at this time that payment of his salary would be deferred, but that he never agreed to the deferral or to a reduction in salary.

C.      The Court finds that Ramgopal stated to employees that a salary reduction would be necessary in light of the financial crisis.  However, the Court also finds that Ramgopol did not seek to secure Moras's agreement to a reduction in Moras's salary.  Nor, the Court finds, did Moras ever agree (orally or in writing) to the reduction of his salary.

D.      The Court finds that, in fall 2008, Moras did agree to a deferral of the payment of his $175,000 annual salary from MPN.  He did so because there was no realistic alternative, given MPN's financial distress.  That deferral is reflected in Moras's February 2, 2009 email exchange with Hugh Webb, MPCM's COO.  *See infra* at ¶ 20.  It is also reflected in the fact that, for 11 of the 12 months between October 1, 2008, and October 1, 2009, Moras did not receive the $14,583

per month he was owed, or even the $10,000 per month to which he would have
been entitled had his annual salary been $120,000.  In seven of those months,
Moras did not receive any pay at all.

19.    Because Moras's May 2008 employment agreement gave MPN the right to
terminate his employment, a relevant issue is whether MPN terminated Moras.  As explained
below, the Court finds that, effective October 1, 2009, Moras ceased to be employed by MPN,
and his employer became MPCM, and that he was thereby constructively terminated by MPN.
Moras and Ramgopal gave uniform testimony that Moras was not terminated before that date.
Moras testified that he was never told that MPN was terminating him.  Ramgopal testified that,
notwithstanding his unilateral attempts to reduce Moras's salary in or around October 2008, he
did not terminate Moras or communicate to Moras that he was terminated.  The Court finds that
MPN did not terminate Moras prior to October 1, 2009.

20.    Because Moras's May 2008 employment agreement provided for the possibility
of a written signed modification of that agreement, a separate relevant issue is whether there was
any such modification.  The defendants have identified one such document during Moras's
employment with MPN:  an email exchange in February 2009 between Moras and Hugh Webb,
COO of MPCM.  Pl. Ex. 18.  In that email chain, on February 2, 2009, Moras complained of
several aspects of his compensation, including noting that "[t]he $120,000 level for an indefinite
period of time is simply not acceptable."  The email also stated:  "Now the best case proposed is
a return to $175,000 after what could be a prolonged period."  *Id.*  The email does not, however,
reflect any agreement by Moras to reduce his salary.  At most, Moras's February 2, 2009 email
reflects his agreement to accept a deferral of his salary in light of MPN's financial troubles.

7

There is, therefore, no evidence of a contemporaneous written, signed modification of the May 2008 Agreement.

> ii. *MPCM*

21.     In 2009, Goldman Sachs agreed to invest in the Marco Polo business, providing it with much-needed financing.  As a precondition for its $5 million investment, Goldman Sachs requested that MPN create a new company.  Ramgopal Aff. ¶ 11.  On September 23, 2009, MPCM was created by transferring most of MPN's assets and business to the new company.  *See generally* Pl. Ex. 12.

22.     As part of the creation of MPCM, all employees of MPN, including Moras, became employees of MPCM as of the closing date.  Pl. Ex. 12, § 2.06.  Moras states that MPN employees were not consulted about this transfer.

23.     Beginning in October 2009, the paychecks that Moras received were from MPCM rather than MPN.

> iii. *The December 2009 Waiver and Release*

24.     In December 2009, MPCM found another investor—Religare Technova ("Religare"), an Indian financial company—which invested $7.5 million in MPCM.  Ramgopal Aff. ¶ 13.

25.     On December 8, 2009, Moras signed an agreement with MPCM entitled "Employee Waiver and Release."  Ex. 11 ("December 2009 Agreement").  The December 2009 Agreement was drafted by Religare and presented to Moras by Webb for his signature.

26.     According to Ramgopal's uncontradicted testimony, the December 2009 Agreement, in which former MPN employees agreed to release all claims against MPN in

exchange for a one-time payment, had been required by Religare as a condition of its $7.5 million investment.  Ramgopal Aff. ¶ 13.  The Court credits this testimony.

27.     The December 2009 Agreement, which referred to Moras as "Employee," began with certain recitations.  These included that:

> A.      "Employee was previously employed" by MPN (which the agreement refers to as the "Former Employer").
>
> B.      "Employee was first hired by [MPCM] effective October 1, 2009 and was not previously paid or employed by [MPCM]."
>
> C.      "Employee claims that MPN was obligated to pay employee for the period from October 1, 2008 to September 30, 2009 (the "Payment Period") $87,4000 in the aggregate [] for foregone wages.  This amount was never formally agreed to and is in dispute."

28.     In substance, the December 2009 Agreement provided that in consideration for MPCM's paying Moras the $87,400, he would release all of the Marco Polo companies, officers, and directors, *inter alia*, from any and all claims against him.  Identical or virtually identical agreements were provided to other employees of MPN whose employment transferred to MPCM on or about October 1, 2008.  The $87,400 reflected, in approximate terms, the amount of money that an employee whose salary had been $120,000 beginning October 1, 2008, would have been owed in back salary by MPN for the period between that date and September 30, 2009, during which period MPN was paying employees less than their full salaries.

29.     Moras knowingly and willingly signed the December 2009 Agreement.  He did so despite the fact that the recitation which the December 2009 Agreement attributed to him was, according to his testimony, inaccurate:  In Moras's view, it was not true that he claimed to be

owed only $87,400.  Rather, Moras believed at the time, and the Court has credited, that his

salary through September 30, 2009, remained $175,000 per year.  Moras did not attempt to

negotiate changes in the recitations in the December 2009 Agreement.  He signed the waiver

because he needed the money, and was worried that, if he did not sign that agreement, he would

never be paid the back wages he was owed.   Moras was not represented by counsel at the time

he signed the December 2009 Agreement.

   30. MPCM failed to make any payment to Moras, as required under the December

2009 Agreement.  Joint Stip. of Facts ¶ 25.  In light of MPCM's breach, the December 2009

Agreement does not bind Moras and, relevant here, does not limit his recovery for back wages to

the $87,400 to which he had agreed.  However, the December 2009 Agreement is probative here

insofar as it reflects and confirms Moras's awareness that, effective October 1, 2009, his

employer was no longer MPN but was now MPCM.

   31. According to Ramgopal and Goldman, MPCM also did not pay the money owed

to any other employees under these waivers.

   32. On December 9, 2010, Moras sent by email to Webb and Goldman a "notice of

default" regarding the December 2009 Agreement.  Joint Stip. of Facts ¶ 28; Ex. 21.  Moras

states in that notice that MPCM failed to pay the $87,400 agreed to in the December 2009

Agreement and that "any previously agreed terms and conditions regarding the [$87,400] are

void and subject to further determination including but not limited to principal, interest,

penalties, and direct and indirect financial damages incurred by Employee."  Ex. 21.

   *iv. MPFIM*

   33. Beginning in August 2009, Moras helped to establish Marco Polo Fixed Income

Mexico ("MPFIM").  MPFIM was formed as a wholly owned subsidiary of Marco Polo Latin

10

America B.V., which in turn is a wholly owned subsidiary of MPCM.  Moras Aff. ¶ 45; Joint

Stip. of Facts ¶ 26.

34.    On January 1, 2010, Moras began service as CEO of MPFIM.

35.    Moras was given a letter dated February 1, 2010, which is on MPCM letterhead.

Ex. 13 ("February 2010 Letter").  It states that he is to be CEO of MPFIM and is to report

directly to Ramgopal.

36.    The February 2010 Letter includes a clause that states Moras's employment is "at-

will."  *Id.* ¶ 5.

37.    The February 2010 Letter is internally inconsistent as to Moras's start date at

MPFIM:  It lists his start date as having "immediate effect," *id.* ¶ 2, but states that his salary is

$120,000 "with effect from January 1, 2010," *id.* ¶ 3.  Moras testified that he began work with

MPFIM on January 1, 2010.  The Court credits that testimony.

38.    While working for MPFIM, Moras testified that he also continued to work for

MPCM's global business, including in Brazil, Colombia, and Africa.  Moras Aff. ¶ 102.  He

further testified that he had the subjective belief that he was working for both MPFIM and

MPCM during this time period.

39.    As a result of his belief that, effective January 1, 2010, he was working for two

distinct entities, Moras earlier in this litigation argued that the $120,000 salary from MPFIM was

on top of his $175,000 salary from MPCM, for an aggregate annual salary of $295,000.  *See*

Moras Aff. ¶¶ 100–103; Second Am. Compl. ¶¶ 48, 52–62.  However, as of trial, Moras revised

his claim, to contend that he continued in 2010 to be owed an aggregate salary of $175,000, but

that, with his move to MPFIM, $120,000 of this sum was owed him by MPFIM and the balance

was owed by MPCM.  Pl. Ex. 28.

40.     The February 2010 letter states that Moras "will devote [his] time exclusively to managing the business of MPFIM."  Ex. 13 ¶ 3.  It does not provide, however, that his formal employment with MPCM would continue after his position at MPFIM took effect.

41.     The Court therefore concludes that Moras was solely employed by MPFIM beginning in January 2010, and thus is not entitled to more than the $120,000 promised in the letter.

### v.   *Moras's Termination*

42.     On January 25, 2011, approximately a month after he submitted the notice of default, Moras was notified by Webb that he had been terminated.  Because Moras was an at-will employee, MPFIM was at liberty to terminate him without cause, and did so.  At trial, Ramgopal testified that the decision to terminate Moras had been made by the management team of Marco Polo Latin America, and that he had not been involved in the decision.

43.     Ramgopal also testified that Moras's notice of default was not part of the decision to terminate him, and that neither he nor the Marco Polo Latin America managers were aware of it at the time.

### vi.   *MPN and MPCM's Aggregate Wage Payments to Moras*

44.     During his employment from May 12, 2008 through January 25, 2011, Moras received $278,115 in wages or advances against his wages from MPN, MPCM, and MPFIM. The parties have stipulated to this number.[1]

---

[1] Between October 2008 and July 2009, when Moras was not receiving a salary, MPN paid him advances that were booked as advances against deferred compensation.  They were not payroll checks, and MPN did not withhold any money from his salary.  Goldman, the CFO, testified that he believes that MPN eventually paid the necessary withholdings.  As to the $278,511 figure reflecting wages and advances paid to Moras during his employment, the parties arrived at this number by agreeing to share equally a reconciling difference amounting to $798.50.  These

45.     Defendants admit that Moras is owed $69,760.  That figure assumes that Moras was entitled to be paid at a $120,000 salary from October 2008 through July 2009, and subtracts the wages and advances that Moras received from October 2008 through this termination from the aggregate compensation he was entitled to, assuming that salary.

46.     Moras never received any equity interest in MPN, MPCM, or MPFIM.

> *vii.*   *MPN and MPCM's Decisions From 2009 Forward Not to Repay Moras the Amount They Concede He Was Owed*

47.     In December 2009, Religare invested $7.5 million in MPCM.  It recommended that $1 million of that sum be allocated to paying employees their back wages.  MPCM's leadership management, including Ramgopal, decided not to do so.  Instead, they decided to use the $1 million for other purposes that they felt were necessary to the survival of the firm.

48.     In August 2010, MPCM prepared a list of unpaid employees and the amount that each was owed.  Ex. 26.  Moras was left off of this list.  At trial, neither Ramgopal nor Goldman could satisfactorily explain why.  Goldman, in fact, could not even explain which Marco Polo entity the list corresponded to.

49.     In May or June 2011, MPCM received $7.5 million in unrestricted funds as part of the unwinding of a deal with Postalis, a Brazilian pension fund.  MPCM did not use any of that $7.5 million to pay its acknowledged debts to Moras.  At some point in late 2009, MPCM did resume paying salaries to its executives and employees.   MPCM, however, determined that repaying its acknowledged debt to Moras was a lower priority than paying the company's continuing obligations, including the salaries of executives such as Rampgopal.

---

wages and advances were paid, the parties have agreed, in accordance with the table attached to their stipulated facts.  Joint Stip. of Facts ¶ 30.

50.     After Moras's termination, Goldman testified, MPCM had made "efforts to pay" the $69,760 that it indisputably owed him.  In fact, this assertion was inaccurate.  Upon questioning by the Court, it became clear that Goldman meant that MPCM had sought to condition its payment of that sum to Moras on his relinquishing his other claims against the Marco Polo entities.

           *viii.*   <u>*Vacation Days*</u>

51.     Moras also claims that he is owed money for unpaid vacation days that he earned in 2011, but had not used as of the date of his termination on January 25, 2011.

52.     The May 2008 Agreement provides that Moras was to receive 15 vacation days per year, prorated from his start date.  The February 2011 Letter does not mention vacation days at all.

53.     The parties agree that unused vacation days expire at the end of the calendar year. *See* Ex. 8, § 4.2.  The only dispute, therefore, is how many vacation days for 2011 Moras had earned by January 25, 2011.

54.     The Marco Polo Group Employee Handbook includes a table setting out how many days an employee will earn depending on his years of service.  *Id.*  Although 2011 was Moras's first year at MPFIM, Moras had been at "Marco Polo Group" companies since May 2008.  On this basis, the Court finds that Moras had entered his third year of service and, per the table in the employee handbook, was entitled to 15 days per calendar year.

55.     Moras argues that he should receive payment for all 15 days, on the assumption that all of the vacation days for the year were accrued as of January 1 of each calendar year. Goldman testified that it was the practice of human resources personnel at MPN and MPCM to calculate vacation days on a prorated basis.

14

56.     The Court credits Goldman's testimony on this point, and finds that vacation days were earned on a prorated basis.  The parties agree that Moras did not take any vacation days in 2011; thus by his date of termination at the end of January, Moras had accrued approximately 1.25 vacation days—that is, one-twelfth of 15 days.  For simplicity's sake, the Court treats the amount of vacation days earned by Moras as of January 25, 2011, his termination date, as the same (1.25) as if he had worked the entire month.

### C. *Ramgopal's Role in the Marco Polo Companies*

57.     During the period of Moras's employment, Ramgopal served as CEO of both MPN and MPCM.  He also served on the boards of both companies.

58.     Moras testified that he understood Ramgopal to be the ultimate decision-maker for both companies.

59.     Ramgopal testified that, in October 2008, "the Board of Directors [and not Ramgopal personally] mandated the reduction of [salary of] all senior management to $10,000 per month."  Ramgopal Aff. ¶ 7.

### D. *Facts Relevant to Piercing the Corporate Veil*

60.     Ramgopal owns 29% of Marco Polo Limited ("MPL").  Ramgopal Aff. ¶ 2.

61.     Ramgopal directly owns 1.2% of MPN; MPL owns approximately 40% of MPN. Ramgopal Aff. ¶ 3.

62.     MPN owns 64% of MPCM; the remaining ownership interest is split between Goldman Sachs (16%) and Religare (20%).  Joint Stip. of Facts ¶¶ 7–8, 14.  Neither Goldman Sachs nor Religare took an active role in management or oversight of MPCM.

63.     Via his holdings in MPN, Ramgopal owns approximately 8% of the equity in MPCM.

64.     During the financial crisis, "[t]he firm was undercapitalized and struggled to survive."  Ramgopal Aff. ¶ 6.  Ramgopal personally loaned $700,000 to Marco Polo (although the record is unclear to which Marco Polo company this loan was made).  Ramgopal Aff. ¶ 8. His friends loaned $1.7 million, at only a nominal interest rate.  *Id.*  Approximately $700,000 of these loans was personally guaranteed by Ramgopal.  Goldman testified that there were no formal loan agreements governing these loans.

65.     MPN held board of director meetings, and minutes of those meetings have been admitted into evidence.  Exs. 23–25, Q.  The most recent documented board meeting, however, was July 27, 2009.  Ex. 24.

66.     There is no documentary evidence that any other Marco Polo company, including MPCM, ever held board meetings.  Ramgopal and Goldman testified that these meetings occurred, and that Ann Chou, general counsel for MPCM, took minutes, but they have never seen copies of these minutes.  Ramgopal testified that the most recent meeting was, in fact, six weeks before trial, but there are no minutes reflecting that it occurred.  The Court, however, credits the testimony that some MPCM board meetings were held.

67.     There is no such legal entity as Marco Polo Group.  It is merely a marketing term, not a holding company of any sort.

68.     When MPCM was created, the transfer agreement transferred employees and assets from MPN to MPCM.  It was signed by Goldman as representative for both companies. Ex. 12.

69.     Ramgopal testified that liability for employees' unpaid salaries was also transferred to MPCM.

70.     MPN and MPCM have the same place of business, the same main telephone number, and substantially overlapping boards of directors.

71.     MPN had a lease with 75 Broad Street for its office space, which it subleased to MPCM and other Marco Polo companies without the benefit of a formal sublease.

72.     MPCM is the only entity that has a payroll function.  MPN ceased to have any payroll function after October 2009, when MPCM was created.

## CONCLUSIONS OF LAW

**I.  Moras's Contract Claim**

On Count One, Moras was undisputedly entitled to a judgment in his favor.  The defendants agree that MPN and MPCM are jointly liable to Moras for the back wages that were never paid.  The parties dispute how much money is owed to Moras.

As noted, the defense acknowledges that $69,760 is owed to Moras.  That figure is based on the defendants' theory that beginning October 1, 2008, Moras's salary, which the May 2008 Agreement had set at $175,000, was reduced to $120,000, and stayed at that level until his termination in January 2011.  Moras counters that his salary was $175,000 for the entire period during which he was employed with any of the Marco Polo entities.

Analysis of this issue properly begins with the May 2008 Agreement.  By its terms, that agreement could be modified only by a signed writing.  Under New York's General Obligations Law § 15-301(1), "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement

unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."[2]

Defendants point to two documents that they argue meet this requirement: (1) a February 2009 email from Moras to Webb, Ex. 18; and (2) the December 2009 Agreement. But neither suffices to modify the May 2008 Agreement. The February 2009 email is neither signed nor an agreement. And its content favors Moras: It evidences that Moras had acquiesced to a deferral of receipt of his contractual salary, not to a reduction of that salary.

As for the December 2009 Agreement, it was drafted and signed long after the alleged October 2008 reduction in Moras's salary, and after Moras had ceased to work for MPN and began working for MPCM. Further, on its face, the December 2009 Agreement does not modify the May 2008 Agreement, but instead was in the form of an accord and satisfaction, in which the parties were agreeing to compromise their claims. In any event, as defendants concede, the December 2009 Agreement was breached by MPCM, thereby depriving it of any binding effect upon Moras. *See* N.Y. Gen. Oblig. Law § 15-501(3). Finally, the statements attributed to Moras in the recitals in the December 2009 Agreement, drafted by Religare as a form waiver and release to be executed by numerous MPN employees, do not vitiate Moras's rights under the

---

[2] Defendants argue that no such writing is necessary, because of the exception for partial performance. *See Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343 (1977) (acknowledging exception to § 15-301(1) where "the oral agreement to modify has in fact been acted upon to completion"). That exception does not apply here, because there is no evidence that Moras partially performed by continuing to work at his existing job at MPN after October 1, 2008, but for a salary that was substantially deferred. Moreover, the record reflects—and the Court credits Moras's testimony on this point—that Moras resisted a reduction in pay from MPN and refused to sign a written agreement reducing his salary. Ex. 18. In any event, the oral contract that defendants posit was entered into was not performed by MPN (*i.e.*, Moras was not paid even a $120,000 salary during this period), so partial performance cannot save defendants from the requirement of a written modification. Defendants are left with the general rule: "[I]f the only proof of an alleged agreement to deviate from a written contract is the oral exchanges between the parties, the writing controls." *Rose*, 42 N.Y.2d at 343.

May 2008 Agreement.  Moras testified, and the Court credits, that when Moras signed the

December 2009 Agreement, including its recital that he was owed $87,400, he in fact believed he

was owed more money (the amount unpaid to him assuming that his $175,000 salary had

continued in force).  The Court finds that Moras's motivation to sign the December 2009

Agreement in the form that it was presented to him was to enable him, after 14 months in which

he received minimal pay, to receive $87,400.

The Court, accordingly, finds that the $175,000 salary continued for the full duration of

Moras's employment by MPN.

In determining the amount of money owed to Moras, the next question, then, is at what

point Moras's employment by MPN terminated.  The record reflects, and the Court has found,

that, upon the creation of MPCM, MPN's employees, including Moras, were transferred to the

new company. Ex. 12.  Beginning in October 2009, Moras began receiving paychecks from

MPCM rather than MPN.  Because Moras was an employee at will, see May 2008 Agreement

¶ 9, he could be terminated for any reason.  *Albert v. Loksen*, 239 F.3d 256, 264 (2d Cir. 2001)

(quoting *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333 (1987)).  His employment contract

with MPN did not require that termination take a particular form, *e.g.*, that it be communicated in

writing.  *See, e.g.*, *Chimarev v. TD Waterhouse Investor Servs., Inc.*, 280 F. Supp. 2d 208, 213–

14 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 259 (2d Cir. 2004) ("Where no particular form of

termination is required by an employment contract, oral termination is equally as effective in

terminating an at-will employee as a written termination letter.").

The Court finds that, at the time that Moras changed employers, he was effectively

terminated from MPN and hired by MPCM under a new, oral contract.  The Court credits the

testimony of Ramgopal and Goldman that all of the other executives had taken a pay cut to

$120,000. The Court also credits Ramgopal's testimony that Moras, along with other employees, was on notice that MPCM intended to pay him (and others) at a $120,000 per year rate. Dating back to October 2008, Ramgopal had, in fact, made MPN's desire to pay Moras at a $120,000 annual rate known to him; however, as long as Moras remained at MPN, his annual salary remained $175,000 because of the absence of a written signed modification of the May 2008 Agreement. Further, once Moras's employer ceased to be MPN and became MPCM, the Court finds it was most reasonable for Moras to understand, and that he impliedly agreed, that his annual salary going forward was to be $120,000. The Court further finds that Moras's transfer to MPCM was effective October 1, 2009, for two reasons. First, in October 2009, Moras began receiving paychecks from MPCM. Second, in the December 2009 Agreement, Moras acknowledged that his employment with MPCM began on that date.

Therefore, Moras's salary was $120,000 ($10,000 per month) starting on October 1, 2009.

As noted, in early 2010, Moras began working for Marco Polo Fixed Income Mexico. His contract with MPFIM expressly stated that his salary was $120,000. The Court does not credit Moras's unsupported assumption that, upon his transfer to MPFIM, his aggregate salary from the Marco Polo entities increased, *i.e.*, to $175,000 because he continued to perform services for MPCM as well. Therefore, the Court finds that, while at MPFIM, Moras's salary remained at $10,000 per month until his termination in January 2011.

The Court accordingly finds for Moras on Count One, and finds that the measure of damages is based on Moras's being contractually entitled (1) to an annual salary of $175,000 between October 1, 2008, and September 30, 2009; and (2) to an annual salary of $120,000, between October 1, 2009, and his termination in January 2011.

## II.    New York Labor Law

In Counts Two and Three, respectively, Moras alleges that defendants violated New York Labor Law by failing to pay him his salary, and seeks liquidated damages and attorney's fees under New York Labor Law section 198.

"[T]he remedies provided in section 198 were intended to be *limited to claims based upon substantive violations of the article*."  *Gottlieb v. Kenneth D. Laub & Co.*, 82 N.Y.2d 457, 463 (1993) (emphasis added).  "[B]y its terms, § 198(3) applies only to 'an action to recover upon a liability imposed by this article'; it therefore does not supply a freestanding right to relief."  *Malinowski v. Wall St. Source, Inc.*, No. 09 Civ. 9592 (PAE), 2012 WL 279450, at *2 (S.D.N.Y. Jan. 31, 2012); *see also Pachter v. Bernard Hodes Group, Inc.*, 10 N.Y.3d 609, 616 (2008) ("[T]he text, history and purpose of [Labor Law § 198(1-a)] indicated that attorney's fees are available only to plaintiffs who prove a violation of article 6.").  "The remedies of section 198 [which include both attorney's fees and liquidated damages] may not be invoked when the claim is in substance a contract claim to enforce the payment of obligations other than statutory wages."  *Fin. Techs. Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 413 (S.D.N.Y. 2002) (citing *Gottlieb*, 82 N.Y.2d at 462–63).

Moras's complaint, which substantially alleges no more and no less than a breach of contract, does not reference any particular provision of the Labor Law.  Instead it generally alleges that "[d]efendants have failed to pay the [p]laintiff wages/salary as defined by New York State Labor Law Section 190 *et seq.*"  Second Am. Compl. ¶ 105.  Here, because Moras does not have valid claims under either section 191 or section 193 of the Labor Law, he does not allege any substantive violations of the statutory provisions.  Moras is not covered by section 191, because that section is inapplicable to executives.  *See* N.Y. Lab. Law § 191; *Pachter*, 10 N.Y.3d

21

at 616 ("[E]mployees serving in an executive . . . capacity do not fall under Section 191 of the

Labor Law."); *Gottlieb*, 82 N.Y.2d at 464; see also *Malinowski*, 2012 WL 279450, at *3.  Nor

can Moras sustain a claim under section 193:  "Section 193 has nothing to do with failure to pay

wages . . ., governing instead the specific subject of making deductions from wages."  *Monagle*

*v. Scholastic, Inc.*, No. 06 Civ. 14342 (GEL), 2007 WL 766282, at *2 (S.D.N.Y. Mar. 9, 2007)

(citing *Kletter v. Fleming*, 32 A.D.3d 566, 567 (3d Dep't 2006)); *see also Jankousky v. N. Fork*

*Bancorporation, Inc.*, No. 08 Civ. 1858 (PAC), 2011 WL 1118602, at *4 (S.D.N.Y. Mar. 23,

2011) (holding that section 193(1) "covers only deductions from agreed upon wages," and was

inapplicable where dispute dealt with disagreement between parties over how wages should be

calculated).

Accordingly, the Court concludes that the provisions of the New York Labor Law are

inapplicable, and Moras is not entitled to liquidated damages, punitive damages, or attorney's

fees.  Judgment on Counts Two and Three has, therefore, been entered for defendants.

## III.    Counts Four and Five

Count Four alleges that defendants have been "unjustly enriched through fraud,

deception[,] and abuse."  Second Am. Compl. ¶¶ 110–113.  Count Five alleges fraud, namely,

that Moras detrimentally relied on "false and fraudulent acts and representations" by Ramgopal.

*Id.* ¶¶ 114–119.

Under New York law, the elements of unjust enrichment are "(1) the defendant

benefitted; (2) at the plaintiff's expense; and (3) equity and good conscience require restitution."

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir.

2010) (summary order).  "Under New York law, '[t]o state a cause of action for fraud, a plaintiff

must allege a representation of material fact, the falsity of the representation, knowledge by the

party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (alterations in original) (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 199 (1st Dep't 2003)).

The Court has not found sufficient evidence of fraud or unjust enrichment to make out either claim.  In particular, Moras has not established that Ramgopal or the Marco Polo defendants enriched themselves at his expense.  To the contrary, the evidence shows that Moras's salary went unpaid because the companies were experiencing severe financial trouble. Notably, during difficult economic times for MPN occasioned by the financial crisis, Ramgopal, Goldman, and other executives also took pay cuts.  There is also no basis to conclude that Ramgopal knowingly misrepresented the company's financial situation to Moras.

To be sure, the Court is troubled by the defendants' persistent refusal to pay Moras the money he was owed.  The record reflects that after the financial crisis, MPCM twice received very substantial infusions of money and was unrestricted in spending it:  $1 million from Religare in December 2009 and $7.5 million from the unwinding of the Postalis investment in May or June 2011.  In neither case did the defendants, including Ramgopal, see fit to pay Moras any of the $69,760 that they concede he was owed, dating back to fall 2008.  Moreover, although Ramgopal and other executives took pay cuts and (like Moras) forewent pay during various periods, defendants chose to prioritize resumption of executives' pay going forward over making Moras whole.  But callousness and insensitivity are not causes of action.  And defendants' insensitivity to Moras's situation does not equate to unjust enrichment.  Quite the contrary, "[u]njust enrichment is an equitable claim that is unavailable where an adequate remedy at law exists." *Fed. Treasury Enter. Sojuzplodoimport*, 400 F. App'x at 613 (citing *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002)).

Accordingly, judgment has been entered for defendants on Counts Four and Five.

## IV.   Piercing the Corporate Veil

Finally, Moras asks the Court to pierce the corporate veil and hold Ramgopal personally liable for MPN and MPCM's breach of contract.

New York law "allows a party to pierce the corporate veil upon showing '(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.'" *Parnell v. Tremont Capital Mgmt. Corp.*, 280 F. App'x 76, 77–78 (2d Cir. 2008) (summary order) (citing *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997))

Under New York law, a court is to consider the following factors in determining whether to pierce the corporate veil:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm[']s length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (citation omitted).

Here, counsel for Moras devoted substantial time at trial to establishing factors that would tend to support piercing the veil as between MPN and MPCM. These include common office space, overlapping ownership, common directors, and failure to deal with each other at arm's length. However, it is unnecessary to determine whether the corporate veil should be

24

pierced as between these two entities, because defendants acknowledge that MPN and MPCM are each liable to Moras to the extent his contractual wages were unpaid.

Defendants do not, however, make any such concession as to Ramgopal.  In the Court's assessment, although there is some evidence that he dominated the Marco Polo entities, there is not enough to meet the "heavy burden" necessary to pierce the veil.  *Christensen v. SBM Indus., Inc.*, 9 F. App'x 52, 53 (2d Cir. 2001) (summary order) (citing *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (N.Y. 1998)).  Further, there is no evidence of fraud.  MPN and MPCM unquestionably were engaged in a legitimate business.  There is no evidence that Ramgopal abused the corporate form for his personal gain.  Although Ramgopal invested much of his own money into the Marco Polo companies, including in trying to recapitalize it after it began to struggle during the financial crisis, there was no evidence adduced at trial that he used MPN or MPCM as a personal piggy bank.  Nor was there evidence that Ramgopal ever acted as sole decision-maker; rather, the evidence reflects that both companies had directors.  Ramgopal and Goldman's testimony that the directors met is uncontradicted, and minutes of MPN directors' meetings were introduced to corroborate this claim.

Where there is sufficient evidence of domination, a court can pierce the corporate veil even where there are no allegations of fraud.  But this is simply not a case in which the "corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego."  *Fernbach, LLC v. Calleo*, 92 A.D.3d 831, 832 (2d Dep't 2012) (quoting *Island Seafood Co. v. Golub Corp.*, 303 A.D.2d 892, 893 (3d Dep't 2003)).  Ultimately, the Court cannot conclude that MPN and MPCM were Ramgopal's alter egos, and therefore cannot pierce the veil on that basis.

**V.      Damages**

Calculating Moras's damages based on unpaid salary is a matter of simple arithmetic. Defendants have admitted, and Moras has not disputed, that had Moras's salary become $120,000 beginning in October 2008, he would be owed $69,760.  The Court has concluded, however, that he should actually have been paid at $175,000 per year for that one-year period (October 1, 2008 through September 30, 2009).  Thus, Moras is owed $55,000 more than defendants acknowledge, or $124,760.

As to Moras's claim that he is owed the value of unused vacation days, the Court has concluded that Moras was entitled to 15 days of vacation a year, and that the proper measure of the accrual of this vacation is on a *pro rata* basis.  Because he was terminated close to the end of January, the Court credits him with the full allotment of vacation days that he would have earned for the full month of January, or 1.25 days.  Calculating a single vacation day to be worth 1/250th of his salary, which subtracts for weekends and federal holidays, the Court finds that Moras is owed $600 (1.25/250th of $120,000, his salary at MPFIM) for unused vacation days.

Adding this to the $124,760 which Moras is entitled to in unpaid salary, the Court holds that Moras is owed $125,360.

Moras is also entitled to prejudgment interest.  "Under New York law . . . a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right." *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991); *see also* C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ."); *Capgemini U.S., LLC v. EC Mange, Inc.*, No. 10 Civ. 2486 (GBD)(HBP), 2012 WL 5938590, at *2 (S.D.N.Y. Nov. 27, 2012).  In New York, the statutory rate for

prejudgment interest in a breach of contract action is nine percent per year.  *See* C.P.L.R. § 5004.[3]

C.P.L.R. § 5001(b) directs that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed."  Counsel for both parties agreed at argument that it is appropriate to measure such interest from the mid-point of the period during which wages were due, but not fully paid.  That midpoint is April 1, 2009.

Accordingly, the Court holds that, on Count One, MPN and MPCM owe Moras $125,360, plus prejudgment interest at 9% per year, calculated from April 1, 2009.

## CONCLUSION

For the reasons stated above, and for the reasons stated on the record at the hearing on December 11, 2012, the Court finds as follows:

1.   On Count One, in favor of plaintiff Albert P. Moras against defendants Marco Polo Network, Inc. and Marco Polo Capital Markets, LLC, in the amount of $125,360.00, plus prejudgment interest at a rate of 9% per annum, to be calculated from April 1, 2009, until December 11, 2012, the date of entry of judgment.  As to the claim in Count One against defendant Vinode Bhesham Ramgopal, judgment has been entered in favor of Ramgopal.

2.   On Counts Two through Five, in favor of all defendants.

---

[3] Although Moras did not specifically request *prejudgment* interest in his Second Amended Complaint, he requested "interest according to law," which is sufficient to preserve his right to prejudgment interest.  *See Mohan v. La Rue Distributors, Inc.*, No. CV 06-0621 FB (RLM), 2008 WL 4822266, at *2 (E.D.N.Y. Oct. 27, 2008).

Judgment consistent with these findings has already been entered.  Dkt. 45.  The Clerk of Court is directed to close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: December 20, 2012
          New York, New York

28